Wayne W. Fang
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, New Jersey 07068
Tel: 973.597.2500

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PURDUE PHARMA L.P., and PURDUE PHARMACEUTICALS L.P.<br><br>Plaintiffs,<br>v.<br><br>ELITE LABORATORIES, INC. and ELITE PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No. 1:23-cv-22221-KMW-AMD<br><br>**FILED UNDER SEAL** |

**SECOND AMENDED COMPLAINT**

Plaintiffs Purdue Pharma L.P., Purdue Pharmaceuticals L.P. (collectively, "Purdue" or "Plaintiffs") for their Second Amended Complaint against Defendants Elite Laboratories, Inc. and Elite Pharmaceuticals, Inc. (collectively, "Elite" or "Defendants"), aver as follows:

## LOCAL RULE 10.1(a) COMPLIANCE

1. Plaintiff Purdue Pharma L.P. ("Purdue Pharma") has its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut 06901-3431; Plaintiff Purdue Pharmaceuticals L.P. ("Purdue Pharmaceuticals") has its principal place of business at 4701 International Boulevard W., Wilson, NC 27893; Defendants both have their principal place of business at 165 Ludlow Ave, Northvale, New Jersey 07647.

## NATURE OF THE ACTION

2. This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code, for infringement of United States Patent Nos. 9,763,933 ("the Mannion '933 patent"); 9,770,416 ("the '416 patent"); 9,492,389 ("the '389 patent"); 9,492,391 ("the '391 patent"); 9,492,392 ("the '392 patent"); 9,492,393 ("the '393 patent"); 9,775,808 ("the '808 patent"); 9,775,811 ("the '811 patent"); 9,763,886 ("the '886 patent"); and 11,964,056 ("the '056 patent") (collectively, "the patents-in-suit"). This action relates to Abbreviated New Drug Application ("ANDA") No. 217939 submitted, upon information and belief, in the name of Defendants to the United States Food and Drug Administration ("FDA").

3. Plaintiffs seek judgment that Defendants have infringed the patents-in-suit, which are—with the exception of the '811 patent and the '886 patent

—listed in the FDA *Approved Drug Products With Therapeutic Equivalence Evaluations* ("Orange Book") as covering Purdue's OxyContin® (oxycodone hydrochloride) ("OxyContin®"), an extended-release pain medication. Defendants have infringed the patents-in-suit at least under 35 U.S.C. § 271(e)(2)(A) by filing ANDA No. 217939 ("Defendants' ANDA"), submitted, upon information and belief, in the name of Elite Laboratories, Inc. ("Elite Labs") to the FDA. Defendants' ANDA seeks approval to market a generic version of Purdue's OxyContin®, which is the subject of approved New Drug Application ("NDA") No. 022272, in the 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg and 80 mg dosage strengths ("Defendants' ANDA Products"). The '811 patent and the '886 patent are directed to the processes for manufacture of OxyContin®.

## THE PARTIES

4. Purdue Pharma is a limited partnership organized and existing under the laws of the State of Delaware. Purdue Pharma is an owner of the patents-in-suit identified in paragraphs 28-37 below. Purdue Pharma is also the holder of approved NDA No. 022272 for OxyContin®, indicated for pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate. Purdue Pharma sells OxyContin® in the United States.

5. Purdue Pharmaceuticals is a limited partnership organized and existing under the laws of the State of Delaware. Purdue Pharmaceuticals is an owner of the patents-in-suit, identified in paragraphs 28-37 below.

6. On information and belief, Elite Labs is a company organized and existing under the laws of the State of Delaware, having a principal place of business at 165 Ludlow Ave, Northvale, New Jersey 07647.

7. On information and belief, Defendant Elite Pharmaceuticals, Inc., USA ("Elite Pharma") is a corporation organized and existing under the laws of the State of Nevada, having a principal place of business at 165 Ludlow Ave, Northvale, New Jersey 07647.

8. On information and belief, Elite Labs is registered to do business in New Jersey as a Foreign For-Profit Corporation.

9. On information and belief, Elite Pharma is registered to do business in New Jersey as a Foreign For-Profit Corporation.

10. On information and belief, Defendant Elite Labs is a wholly-owned subsidiary of Elite Pharma. Elite Pharma's website notes that "Elite operates a cGMP and DEA registered facility for research, development, and manufacturing located in Northvale, NJ."

11. On information and belief, Defendants develop, manufacture, distribute and/or market pharmaceutical products throughout the United States,

including in this judicial district, through their own actions and through the actions of their agents.

12. On information and belief, Defendants are working in concert and both are each separately involved in the development, regulatory approval, marketing, sale and/or distribution of pharmaceutical products, including the Defendants' ANDA Products described in Defendants' ANDA.

13. For example, Elite Pharma issued a press release on October 7, 2024 evidencing its involvement in the activities detailed in paragraph 12, titled "Elite Pharmaceuticals Announces Commercial Launch of Acetaminophen and Codeine Phosphate Tablets," stating that "the company [Elite Pharma] has launched Elite's generic version of Tylnol® with Codeine (acetaminophen and codeine phosphate) 300mg/15mg, 300mg/30mg, and 300mg/60mg tablets" and noting that "[t]his product is marketed and sold under the Elite Laboratories, Inc. label." https://elite.irpass.com/Elite-Pharmaceuticals-Announces-Commercial-Launch-of-Acetaminophen-and-Codeine-Phosphate-Tablets-10-7-2024 (last accessed July 1, 2025).

14. On November 18, 2024, Elite Pharma issued another press release demonstrating its involvement in these activities titled "Elite Pharmaceuticals Receives FDA Approval for Generic Vyvanse," stating that "it [Elite Pharma] received approval from the US Food and Drug Administration (FDA)

for an Abbreviated New Drug Application (ANDA) for a generic version of Vyvanse® (Lisdexamfetamine Dimesylate) with strengths of 10 mg, 20 mg, 30 mg, 40 mg, 50 mg, 60 mg and 70 mg capsules." https://elite.irpass.com/Elite-Pharmaceuticals-Receives-FDA-Approval-for-Generic-Vyvanse-11-18-2024 (last accessed July 1, 2025). Then, on December 26, 2024, Elite Pharma issued a press release titled "Elite Pharmaceuticals Announces Commercial Launch of Generic Vyvanse®, " stating that "the company [Elite Pharma] has launched Elite's generic version of Vyvanse®" and noting that "[t]his product is marketed and sold under the Elite Laboratories, Inc. label." https://elite.irpass.com/Elite-Pharmaceuticals-Announces-Commercial-Launch-of-Generic-Vyvanse174--12-26-2024 (last accessed July 1, 2025).

15. On information and belief, Defendants closely coordinate their commercial activities and simultaneously share senior corporate officers.

16. On information and belief, Defendants were jointly and separately involved in the preparation and submission of Defendants' ANDA.

17. On information and belief, if Defendants' ANDA is approved, Defendants will be jointly and separately involved in the manufacturing, marketing, distributing and/or sale of Defendants' ANDA Products, as they have done with other generic drugs (e.g., those listed in ¶¶ 13-14 above).

## SUBJECT MATTER JURISDICTION AND VENUE

18. This action arises under the patent laws of the United States, including 35 U.S.C. § 271 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

20. Defendants have stipulated that "[f]or purposes of only the Action, Defendants will not contest venue in the District of New Jersey," and "Defendants therefore will not move to dismiss the Action on the grounds that the District of New Jersey is an improper venue for the Action." (Dkt. No. 11 at 3 ¶ 2.)

21. Notwithstanding Defendants' stipulation, venue is proper in this Court pursuant to 28 U.S.C. § 1400(b) because Defendants have a regular and established place of business in this judicial district and because Defendants have committed acts of infringement in this judicial district.

## PERSONAL JURISDICTION

22. Defendants have stipulated that "[f]or purposes of only the Action, Defendants will not contest jurisdiction over their persons," and "Defendants therefore will not move to dismiss the Action on grounds that the United States District Court for the District of New Jersey lacks jurisdiction over Defendants in the Action." (Dkt. No. 11 at 3 ¶ 1.)

23. Notwithstanding Defendants' stipulation to personal jurisdiction, on information and belief, this Court has personal jurisdiction over each of the Defendants by virtue of, *inter alia,* having their principal place of business located at 165 Ludlow Ave, Northvale, New Jersey.

24. Moreover, on information and belief, this Court has personal jurisdiction over each of the Defendants by virtue of, *inter alia,* their systematic and continuous contacts with New Jersey and contacts with New Jersey in connection with the submission of Defendants' ANDA, as set forth below.

25. On information and belief, work related to Defendants' ANDA submission occurred at Defendants' principal place of business located at 165 Ludlow Ave, Northvale, New Jersey.

26. On information and belief, Defendants are in the business of preparing generic pharmaceuticals that they distribute in the State of New Jersey and throughout the United States.

27. On information and belief, if Defendants' ANDA is approved, the Defendants' ANDA Products would, among other things, be marketed and distributed in New Jersey, and/or prescribed by physicians practicing and dispensed by pharmacies located within New Jersey, all of which would have a substantial effect on New Jersey.

## THE PATENTS-IN-SUIT

28. Purdue is the lawful owner of all right, title and interest in the Mannion ’933 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The Mannion ’933 patent is listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272. A copy of the Mannion ’933 patent is attached hereto as Exhibit A, which was duly and legally issued on September 19, 2017, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

29. Purdue is the lawful owner of all right, title and interest in the ’416 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The ’416 patent is listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272. A copy of the ’416 patent is attached hereto as Exhibit B, which was duly and legally issued on September 26, 2017, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

30. Purdue is the lawful owner of all right, title and interest in the ’389 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The ’389 patent is listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No.

022272. A copy of the ’389 patent is attached hereto as Exhibit C, which was duly and legally issued on November 15, 2016, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

31. Purdue is the lawful owner of all right, title and interest in the ’391 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The ’391 patent is listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272. A copy of the ’391 patent is attached hereto as Exhibit D, which was duly and legally issued on November 15, 2016, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

32. Purdue is the lawful owner of all right, title and interest in the ’392 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The ’392 patent is listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272. A copy of the ’392 patent is attached hereto as Exhibit E, which was duly and legally issued on November 15, 2016, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

33. Purdue is the lawful owner of all right, title and interest in the ’393 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The ’393 patent is listed in the

Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272. A copy of the ’393 patent is attached hereto as Exhibit F, which was duly and legally issued on November 15, 2016, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

34. Purdue is the lawful owner of all right, title and interest in the ’808 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The ’808 patent is listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272. A copy of the ’808 patent is attached hereto as Exhibit G, which was duly and legally issued on October 3, 2017, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

35. Purdue is the lawful owner of all right, title and interest in the ’056 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. The ’056 patent is listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272. A copy of the ’056 patent is attached hereto as Exhibit H, which was duly and legally issued on April 23, 2024, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

36. Purdue is the lawful owner of all right, title and interest in the ’811 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right

to sue and to recover for past infringement thereof. A copy of the ’811 patent is attached hereto as Exhibit I, which was duly and legally issued on October 3, 2017, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

37. Purdue is the lawful owner of all right, title and interest in the ’886 patent, titled “TAMPER RESISTANT DOSAGE FORMS,” including the right to sue and to recover for past infringement thereof. A copy of the ’886 patent is attached hereto as Exhibit J, which was duly and legally issued on September 19, 2017, naming William H. McKenna, Richard O. Mannion, Edward P. O’Donnell, and Haiyong H. Huang as the inventors.

**DEFENDANTS’ ANDA**

38. On information and belief, on or before September 28, 2023, Defendants filed Defendants’ ANDA in the name of Elite Labs with the FDA, under § 505(j) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, sale, offer for sale, or importation of Defendants’ ANDA Products, generic products based on the Reference Listed Drug OxyContin®, which is the subject of approved NDA No. 022272.

39. In particular, in the cover letter to Defendants’ ANDA Pre-Submission (sequence 0001) to FDA, dated [redacted], the drug product

applicant was identified as Elite Labs, but FDA was instructed that "[f]or correspondence, please contact [Elite Pharma's] Regulatory Affairs Office by email at regulatory@elitepharma.com," and that the "[p]rimary contact is Sharen Sharp (PM and RA Associate) and secondary contact is Nasrat Hakim (President & CEO)." *See* Exhibit K.

40. Similarly, in the cover letter to Defendants' ANDA Original ANDA Submission (sequence 0002) to FDA, dated [redacted], the drug product applicant is identified as Elite Labs, but FDA was again instructed "[f]or correspondence, please contact [Elite Pharma's] Regulatory Affairs Office by email at regulatory@elitepharma.com," and that the "[p]rimary contact is Sharen Sharp (PM and RA Associate) and secondary contact is Nasrat Hakim (President & CEO)." *See* Exhibit L.

41. Sharen Sharpe is an employee of Elite Pharma, *see* Exhibit M, and Nasrat Hakim is the President & CEO of Elite Pharma, *see* https://elitepharma.com/management-key-employees/ (last accessed July 1, 2025).

42. Moreover, in a press release dated September 25, 2023, titled "Elite Pharmaceuticals Files ANDA with US FDA to Market Opiate Analgesic Product," Elite Pharma stated that "it [Elite Pharma] filed an Abbreviated New Drug Application on August 17, 2023, and was accepted for review by the US Food and Drug Administration (FDA) on September 19, 2023 for an undisclosed generic drug

product in a class of medications called opiate analgesics." https://elite.irpass.com/Elite-Pharmaceuticals-Files-ANDA-with-US-FDA-to-Market-Opiate-Analgesic-Product-9-25-2023 (last accessed July 1, 2025). On information and belief, the ANDA referenced in Elite Pharma's September 25, 2023 press release is Defendants' ANDA.

43. In sum, Defendant Elite Labs is identified in the ANDA as the applicant. *See* Exhibits K and L. An employee of Defendant Elite Pharma signed the ANDA submission and is identified as the primary contact for Defendants' ANDA, and the President & CEO of Elite Pharma is identified as the secondary contact. *Id.* Moreover, on information and belief, both Elite Labs and Elite Pharma participated in the preparation of Defendants' ANDA and intend to and will directly benefit from approval of Defendants' ANDA. Accordingly, both Defendants' are "submitters" of Defendants' ANDA and are liable for infringement under 35 U.S.C. § 271(e)(2). *See, e.g.*, *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 527–28 (Fed. Cir. 2012) (noting that Apotex U.S. could be deemed as having submitted, and thus infringed, patent-in-suit because "Apotex U.S. filed the ANDA and actively participated with Apotex Canada in preparation of the ANDA" and "intends to directly benefit from the ANDA"); *see also, e.g.*, *Cephalon, Inc. v. Watson Pharms., Inc.*, 629 F. Supp. 2d 338, 349 (D. Del. 2009) (internal quotation omitted) ("Parties actively involved in preparing the ANDA are deemed to have submit[ted] the

ANDA, regardless of whether they are the named applicant; this is especially true where the parties involved are in the same corporate family.”).

44. On information and belief, Defendants subsequently submitted in their ANDA a “Paragraph IV” certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) alleging that, *inter alia*, the patents-in-suit, listed in the Orange Book as covering OxyContin®, which is the subject of approved NDA No. 022272, are “invalid, unenforceable, and/or will not be infringed” by the commercial manufacture, use, offer for sale, sale or importation of the drug products described in Defendants’ ANDA.

45. In a letter dated September 28, 2023, addressed to and received by Purdue Pharma on or about September 29, 2023, Defendants provided what purports to be a “Notice of Paragraph IV Certification” with respect to Defendants’ ANDA and Defendants’ ANDA Products, and the Orange Book patents, except the ’056 patent, under § 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act (“Notice Letter”). The letter was signed by “Nasrat Hakim CEO, Elite Laboratories, Inc.”—the same Nasrat Hakim who is identified as the President & CEO of Elite Pharma on Elite Pharma’s website. *Compare* Exhibit N at 3 *with* https://elitepharma.com/management-key-employees/ (last accessed July 1, 2025).

46. In a letter dated March 28, 2025, addressed to and received by Purdue Pharma on or about March 31, 2025, Defendants provided what purports to

be a supplemental "Notice of Paragraph IV Certification" with respect to Defendants' ANDA and Defendants' ANDA Products, and the Orange Book patents, including the '056 patent, under § 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act ("Supplemental Notice Letter"). The letter was signed by "Nasrat Hakim CEO, Elite Laboratories, Inc."—the same Nasrat Hakim who is identified as the President & CEO of Elite Pharma on Elite Pharma's website. *Compare* Exhibit O at 3 *with* https://elitepharma.com/management-key-employees/ (last accessed July 1, 2025).

47. Defendants' submission of Defendants' ANDA was an act of infringement of the Orange Book patents under the United States Patent Law, 35 U.S.C. § 271(e)(2)(A).

48. Plaintiffs commenced this action within the 45-day period after receiving the Notice Letter as described in 21 U.S.C. § 355(j)(5)(B)(iii).

**DEFENDANTS' ANDA PRODUCTS**

49. [redacted]

[redacted]

50. [redacted]

[redacted]

*See* Exhibit Q at 10.

51. [redacted]

**<u>FIRST CLAIM FOR RELIEF</u>**
**(PATENT INFRINGEMENT OF U.S. PATENT NO. 9,763,933)**

52. Purdue incorporates by reference and realleges paragraphs 1 through 51 above as though fully restated herein.

53. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the Mannion '933 patent by Defendants.

54. Defendants' ANDA Products, or the use or manufacture thereof, are covered by one or more claims of the Mannion '933 patent, either literally or under the doctrine of equivalents, including claims 9-10 depending from independent claim 1, and claims 13, 25-26, and 29-30 depending from independent 11, as detailed in Exhibit S attached hereto.

55. Independent claim 1 recites:

> 1. A pharmaceutical composition comprising:
>
> at least one active agent;
>
> at least one high molecular weight polyethylene oxide (PEO) having an approximate molecular weight of from 1 million to 15 million;
>
> optionally at least one additive;
>
> optionally at least one film coating; and
>
> optionally at least one low molecular weight PEO having an approximate molecular weight of less than 1,000,000; wherein
>
> (a) the active agent and high molecular weight PEO are combined in a solid oral extended release dosage form that is (i) compression shaped, (ii) air cured by heated air, without compression, for at least about 5 minutes at a temperature above the softening temperature of the high molecular weight PEO, (iii) cooled, and (iv) hardened;
>
> (b) the high molecular weight PEO comprises at least about 30% (by weight) of the dosage form;
>
> (c) the molecular weight of each PEO is based on rheological measurements; and
>
> (d) the total weight of the dosage form is calculated by excluding the combined weight of said film coatings.

56. Dependent claim 9 depends from claims 7, 6, 5, 4, and 1:

> 4. A pharmaceutical composition according to claim 1, wherein the curing temperature is at least about 60° C. and the curing time is at least about 10 minutes.

5. A pharmaceutical composition according to claim 4, wherein the curing temperature does not exceed about 90° C. and the curing time does not exceed about 24 hours.

6. A pharmaceutical composition according to claim 5, wherein the curing time does not exceed about 10 hours.

7. A pharmaceutical composition according to claim 6, wherein the active agent comprises at least about 1.3% of the dosage form and the dosage form comprises a tablet.

9. A pharmaceutical composition according to claim 7, wherein the dosage form is expanded upon curing, as measured by a decrease in density of at least about 1%, and the dosage form provides a hardness of at least about 439 N.

57. Dependent claim 10 depends from claim 9:

10. A pharmaceutical composition according to claim 9, wherein at least one film coating is present; at least one additive is present; and the additive is selected from at least one of an anti-tacking agent, an antioxidant, an immediate release component, and a retardant.

58. Independent claim 11 recites:

11. A pharmaceutical composition comprising:

at least one active agent comprising an opioid or a pharmaceutically acceptable salt thereof;

at least one high molecular weight polyethylene oxide (PEO) having an approximate molecular weight of from 1 million to 8 million;

at least one additive comprising an anti-tacking agent, an antioxidant, an immediate release component, or a retardant;

optionally a film coating; and

optionally at least one low molecular weight PEO having an approximate molecular weight of less than 1,000,000; wherein

(a) the active agent and high molecular weight PEO are combined in a solid oral extended release dosage form that is (i) compression shaped, (ii) air cured by heated air, without compression, for a curing time of at least about 10 minutes at a curing temperature of at least about 60° C., (iii) cooled, and (iv) hardened;

(b) the high molecular weight PEO comprises at least about 30% (by weight) of the dosage form;

(c) the active agent comprises at least about 1.3% (by weight) of the dosage form;

(d) the molecular weight of each PEO is based on rheological measurements; and

(e) the total weight of the dosage form is calculated by excluding the combined weight of said film coatings.

59. Dependent claim 13 depends from claims 12 and 11:

12. A pharmaceutical composition according to claim 11,

wherein the dosage form is a tablet;

at least one additive comprises an anti-tacking agent;

the compression shaped tablet is cured and cooled in a convection curing device provided with inlet air, exhaust air, and a bed of free flowing tablets;

the tablet is cured by air having a curing temperature of about 60° C. to about 90° C., for a curing time of about 10 minutes to about 10 hours, and is cooled by air having a cooling temperature below about 50° C.; and

each of the curing temperature and the cooling temperature is one of (a) the temperature of the inlet air, or (b) the temperature of the exhaust air.

13. A pharmaceutical composition according to claim 12, wherein the tablet is expanded upon curing, as measured by a decrease in tablet density of at least about 1%.

60. Dependent claim 25 depends from claim 12:

25. A pharmaceutical composition according to claim 12, wherein the tablet is expanded upon curing, as measured by a decrease in tablet density of at least about 2%.

61. Dependent claim 26 depends from claim 25:

26. A pharmaceutical composition according to claim 25, wherein the total of high and low molecular weight PEO comprises at least about 65% (by weight) of the dosage form.

62. Dependent claim 29 depends from claim 25:

> 29. A pharmaceutical composition according to claim 25, wherein the total of high and low molecular weight PEO comprises at least about 50% (by weight) of the dosage form.

63. Dependent claim 30 depends from claim 29:

> 30. A pharmaceutical composition according to claim 29, wherein the high molecular weight PEO has an approximate molecular weight selected from 4 million and 7 million.

64. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 9-10, 13, 25, 26, and 29-30 of the Mannion '933 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the Mannion '933 patent.

65. Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 9-10, 13, 25, 26, and 29-30 of the Mannion '933 patent.

66. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants' infringement of the Mannion '933 patent. Purdue has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**(PATENT INFRINGEMENT OF U.S. PATENT NO. 9,770,416)**

67. Purdue incorporates by reference and realleges paragraphs 1 through 66 above as though fully restated herein.

68. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the '416 patent by Defendants.

69. On information and belief, Defendants' ANDA Products, or use thereof, are covered by one or more claims of the '416 patent, either literally or under the doctrine of equivalents, including but not limited to independent claims 1 and 12, claims 2-5, 9-11, 13-16, and 19-29 dependent therefrom, as detailed in Exhibit S attached hereto.

70. Independent claim 1 recites:

> 1. A pharmaceutical composition comprising:
>
> at least one active agent comprising an opioid or a pharmaceutically acceptable salt thereof;
>
> at least one high molecular weight polyethylene oxide (PEO), having an approximate molecular weight of from 1 million to 8 million;
>
> optionally at least one low molecular weight PEO having an approximate molecular weight of less than 1,000,000; wherein
>
> (a) the active agent and high molecular weight PEO are combined in a solid oral extended release dosage form that is (i) compression shaped, (ii) air cured by heated air, without compression, for a curing time of about 15 minutes to about 8 hours at a curing temperature of about 60° C. to about 90° C., (iii) cooled, and (iv) hardened;

(b) the high molecular weight PEO is at least partially melted upon curing and comprises at least about 50% (by weight) of the dosage form;

(c) the active agent comprises at least about 1.3% (by weight) of the dosage form;

(d) the molecular weight of each PEO is based on rheological measurements;

(e) the total weight of the dosage form is calculated by excluding the combined weight of said film coatings; and

(f) the dosage form is expanded upon curing, as measured by a decrease in density of at least about 1.5%, and the dosage form provides a hardness of at least about 439 N.

71. Dependent claim 2 depends from claim 1:

2. A pharmaceutical composition according to claim 1, wherein the high molecular weight PEO is selected from at least one PEO having an approximate molecular weight of 1 million, 2 million, 4 million, 5 million, 7 million, and 8 million.

72. Dependent claim 3 depends from claim 2:

3. A pharmaceutical composition according to claim 2, wherein the active agent (i) is selected from the group consisting of buprenorphine, oxycodone, oxymorphone, hydrocodone, hydromorphone, morphine, and pharmaceutically acceptable salts thereof.

73. Dependent claim 4 depends from claim 3:

4. A pharmaceutical composition according to claim 3, wherein the active agent comprises at least about 2.4% (by weight) of the dosage form.

74. Dependent claim 5 depends from claim 4:

5. A pharmaceutical composition according to claim 4, wherein the curing temperature is from about 70° C. to about 85° C. and the curing time is from about 15 minutes to about 5 hours.

75. Dependent claim 9 depends from claim 3:

9. A pharmaceutical composition according to claim 3, wherein the active agent comprises at least about 5% (by weight) of the dosage form.

76. Dependent claim 10 depends from 9:

10. A pharmaceutical composition according to claim 9, wherein the curing temperature is from about 70° C. to about 85° C. and the curing time is from about 15 minutes to about 5 hours.

77. Dependent claim 11 depends from claim 10:

11. A pharmaceutical composition according to claim 10, wherein the active agent is oxycodone hydrochloride, and the high molecular weight PEO is selected from 4 million and 7 million, and comprises at least about 65% (by weight) of the dosage form.

78. Independent claim 12 recites:

12. A pharmaceutical tablet comprising:

a dosage amount of least one active agent comprising an opioid or a pharmaceutically acceptable salt thereof;

at least one high molecular weight polyethylene oxide (PEO) having an approximate molecular weight of from 1 million to 8 million;

at least one additive comprising an anti-tacking agent, an antioxidant, an immediate release component, or a retardant;

at least one film coating; and

optionally at least one low molecular weight PEO having an approximate molecular weight of less than 1,000,000; wherein

(a) the active agent and high molecular weight PEO are combined in a solid oral extended release tablet that is (i) shaped by direct compression, (ii) air cured by heated air, without compression, for a curing time of at least 15 minutes at a curing temperature of at least about 65° C., (iii) cooled at a cooling temperature below about 50° C., and (iv) hardened;

(b) the high molecular weight PEO comprises at least about 50% (by weight) of the dosage form;

(c) the active agent comprises at least about 2.4% (by weight) of the dosage form;

(d) the molecular weight of each PEO is based on rheological measurements; and

(e) the total weight of the dosage form is calculated by excluding the combined weight of said film coatings; and

(f) the dosage form is expanded upon curing, as measured by a decrease in density of at least about 1.5%, and the dosage form provides a hardness of at least about 439 N.

79. Dependent claim 13 depends from claim 12:

13. A pharmaceutical composition according to claim 12, wherein

at least one additive comprises an anti-tacking agent;

the compression shaped tablet is cured and cooled in a convection curing device provided with inlet air, exhaust air, and a bed of free flowing tablets; and

each of the curing temperature and the cooling temperature is one of (a) the temperature of the inlet air, or (b) the temperature of the exhaust air.

80. Dependent claim 14 depends from claim 13:

14. A pharmaceutical composition according to claim 13, wherein the convection curing device is a coating pan.

81. Dependent claim 15 depends from claim 14:

15. A pharmaceutical composition according to claim 14, wherein the curing temperature has a plateau-like profile.

82. Dependent claim 16 depends from claim 15:

16. A pharmaceutical composition according to claim 15, wherein each of the curing temperature and cooling temperature is the temperature of the exhaust air.

83. Dependent claim 19 depends from claim 16:

19. A pharmaceutical composition according to claim 16, wherein at least one of the additive and the film coating comprises at least one of butylated hydroxytoluene (BHT), magnesium stearate, talc, silica, fumed silica, colloidal silica dioxide, calcium stearate, carnauba wax, stearic acid, stearyl alcohol, mineral oil, paraffin, micro crystalline

cellulose, glycerin, propylene glycol, polyethylene glycol, lactose, povidone, triacetin, and hydroxypropyl cellulose.

84. Dependent claim 20 depends from claim 16:

20. A pharmaceutical composition according to claim 16, wherein at least one additive is magnesium stearate.

85. Dependent claim 21 depends from claim 16:

21. A pharmaceutical composition according to claim 16, wherein the tablet, when subjected to about 15,000 pounds of applied pressure from a hydraulic press, provides a flattened tablet that

is flattened without breaking apart;

has a thickness that is no more than about 50% of the thickness of the non-flattened tablet; and

provides a dissolution of active agent, with ethanol, that deviates no more than about 15% points from the dissolution of a non-flattened reference tablet, without ethanol;

wherein dissolution is measured (i) as a percent amount of active agent released at selected time points up to and including at least a 2 hour period; (ii) using a USP Apparatus 1 (basket) at 37° C. and 100 rpm, in 900 ml simulated gastric fluid without enzymes (SGF) for the non-flattened tablet, and further comprising 40% ethanol for the flattened tablet.

86. Dependent claim 22 depends from claim 21:

22. A pharmaceutical composition according to claim 21, wherein the tablet,

when measured (a) without an antioxidant additive and (b) as the average of at least 10 of 100 tablet samples stored at 40° C. and 75% relative humidity for at least 3 months;

provides a dissolution of the active agent that deviates no more than about 10% points from the dissolution of a reference tablet before storage;

wherein dissolution is measured (i) as a percent amount of active agent released at selected time points up to and including at least a 12 hour

period; (ii) using a USP Apparatus 1 (basket) at 37° C. and 100 rpm, in 900 ml simulated gastric fluid without enzymes (SGF).

87. Dependent claim 23 depends from claim 22:

23. A pharmaceutical composition according to claim 22, wherein the deviation in dissolution upon flattening is no more than about 15% points and the deviation in dissolution upon storage is no more than about 5% points.

88. Dependent claim 24 depends from claim 23:

24. A pharmaceutical composition according to claim 23, wherein the deviation in dissolution upon storage is no more than about 3% points.

89. Dependent claim 25 depends from claim 23:

25. A pharmaceutical composition according to claim 23, wherein the stored dosage form comprises degradation products of the active agent in a total amount that is no greater than about 0.1% (by weight) of the dosage amount.

90. Dependent claim 26 depends from claim 23:

26. A pharmaceutical composition according to claim 23, wherein the high molecular weight PEO has an approximate molecular weight selected from 4 million and 7 million.

91. Dependent claim 27 depends from claim 23:

27. A pharmaceutical composition according to claim 23, wherein the tablets are stored for at least 6 months.

92. Dependent claim 28 depends from claim 27:

28. A pharmaceutical composition according to claim 27, wherein the stored dosage form comprises degradation products of the active agent in a total amount that is no greater than about 0.1% (by weight) of the dosage amount.

93. Dependent claim 29 depends from claim 28:

> 29. A pharmaceutical composition according to claim 28, wherein the active agent is a pharmaceutically acceptable salt of oxycodone and the tablet is suitable for twice-daily administration.

94. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 1-5, 9-16, and 19-29 of the '416 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the '416 patent.

95. Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 1-5, 9-16, and 19-29 of the '416 patent.

96. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants' infringement of the '416 patent. Purdue has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
## (PATENT INFRINGEMENT OF U.S. PATENT NO. 9,492,389)

97. Purdue incorporates by reference and realleges paragraphs 1 through 96 above as though fully restated herein.

98. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the '389 patent by Defendants.

99. Defendants' ANDA Products, or the use or manufacture thereof, are covered by one or more claims of the '389 patent, either literally or under the doctrine of equivalents, including claims 18-20 and 28-30 depending from independent claim 1, as detailed in Exhibit S attached hereto.

100. Independent claim 1 recites:

> 1. A cured shaped pharmaceutical tablet comprising:
>
> (1) at least a first compression shaped and then air cured matrix, wherein said curing is without compression, by heated air having a temperature of at least about 62° C. for a duration of at least about 5 minutes, said matrix comprising an opioid or a pharmaceutically acceptable salt thereof in combination with at least one high molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight selected from the group consisting of 4,000,000, 7,000,000, and a combination thereof, and optionally further comprising at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000;
>
> (2) optionally a second air cured matrix comprising an opioid or a pharmaceutically acceptable salt thereof in combination with at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000; and
>
> (3) optionally a coating,
>
> wherein, in said tablet:
>
> said high molecular weight polyethylene oxide is at least 54% by weight of the total weight of said uncoated tablet;

low molecular weight polyethylene oxide, if present, is at least 10% by weight of the total weight of said uncoated tablet; and

said tablet provides a once-daily or twice-daily extended release of said opioid or pharmaceutically acceptable salt thereof from said tablet.

101. Dependent claim 18 depends from claim 1:

18. A cured shaped tablet as defined in claim 1, wherein said tablet, when subjected to an indentation test, has at least one of (i) a cracking force of at least 110 N; and (ii) a penetration depth to crack distance of at least 1.0 mm.

102. Dependent claim 19 depends from claim 1:

19. A cured shaped tablet as defined in claim 1, wherein said tablet can be flattened to a thickness that is no more than about 60% of the initial tablet thickness without breaking; and said flattened tablet swells upon exposure to water or ethanol.

103. Dependent claim 20 depends from claim 1:

20. A cured shaped tablet according to claim 1, wherein, after a plurality of at least 100 of the same tablets are stored at 40° C. and 75% relative humidity for at least 3 months, a set of at least ten of said stored tablets, on average, when measured in a USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) at 37° C., in the absence of an added stabilizer, release an amount of said opioid or pharmaceutical salt thereof, after 1 hour, 4 hours, and 12 hours, that deviates from an initial dosage amount of said opioid or pharmaceutically acceptable salt thereof by no more than about 10% points.

104. Dependent claim 28 depends from claim 19:

28. A cured shaped tablet as defined in claim 19, wherein said tablet, when subjected to an indentation test, has at least one of (i) a cracking force of at least 110 N; and (ii) a penetration depth to crack distance of at least 1.0 mm.

105. Dependent claim 29 depends from claim 1:

> 29. A cured shaped tablet as defined in claim 1 wherein said cured shaped tablet has a density that is at least about 1% lower than the density of said shaped tablet prior to curing.

106. Dependent claim 30 depends from claim 4, 3, and 1:

> 3. A cured shaped tablet as defined in claim 1, wherein each shaped and cured matrix has been cured by heated air having a temperature of about 62° C. to about 90° C. for a duration of about 15 minutes to about 10 hours, and then is subsequently cooled.
>
> 4. A cured shaped tablet as defined in claim 3, wherein said heated air temperature is from about 65° C. to about 90° C., said duration is from about 15 minutes to about 8 hours, and said cooling comprises exposure to an air temperature of less than about 62° C.
>
> 30. A cured shaped tablet as defined in claim 4 wherein said cured shaped tablet has a density that is at least about 1% lower than the density of said shaped tablet prior to curing.

107. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 18-20, and 28-30 of the '389 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the '389 patent.

108. Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 18-20, and 28-30 of the '389 patent.

109. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants' infringement of the '389 patent. Purdue has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
## (PATENT INFRINGEMENT OF U.S. PATENT NO. 9,492,391)

110. Purdue incorporates by reference and realleges paragraphs 1 through 109 above as though fully restated herein.

111. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the '391 patent by Defendants.

112. Defendants' ANDA Products, or the use thereof, are covered by one or more claims of the '391 patent, either literally or under the doctrine of equivalents, including claims 18-20 and 28-30 depending from independent claim 1, as detailed in Exhibit S attached hereto.

113. Independent claim 1 recites:

> 1. A method of treating pain comprising administering to a patient in need thereof a pharmaceutical tablet comprising:
>
> (1) at least a first compression shaped and then air cured matrix, wherein said curing is without compression, by heated air having a temperature of at least about 62° C. for a duration of at least about 5

minutes, said matrix comprising an opioid or a pharmaceutically acceptable salt thereof in combination with at least one high molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight selected from the group consisting of 4,000,000, 7,000,000, and a combination thereof, and optionally further comprising at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000;

(2) optionally a second air cured matrix comprising an opioid or a pharmaceutically acceptable salt thereof in combination with at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000; and

(3) optionally a coating,

wherein, in said tablet:

said high molecular weight polyethylene oxide is at least 54% by weight of the total weight of said uncoated tablet;

said low molecular weight polyethylene oxide, if present, is at least 10% by weight of the total weight of said uncoated tablet; and

said tablet provides a once-daily or twice-daily extended release tablet of said opioid or pharmaceutically acceptable salt thereof from said tablet.

114. Dependent claim 18 depends from claim 1:

18. A method as defined in claim 1, wherein said tablet, when subjected to an indentation test, has at least one of (i) a cracking force of at least 110 N; and (ii) a penetration depth to crack distance of at least 1.0 mm.

115. Dependent claim 19 depends from claim 1:

19. A method as defined in claim 1, wherein said tablet can be flattened to a thickness that is no more than about 60% of the initial tablet thickness without breaking; and said flattened tablet swells upon exposure to water or ethanol.

116. Dependent claim 20 depends from claim 1:

> 20. A method according to claim 1, wherein, after a plurality of at least 100 of the same tablets are stored at 40° C. and 75% relative humidity for at least 3 months, a set of at least ten of said stored tablets, on average, when measured in a USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) at 37° C., in the absence of an added stabilizer, release an amount of said opioid or pharmaceutical salt thereof, after 1 hour, 4 hours, and 12 hours, that deviates from an initial dosage amount of said opioid or pharmaceutically acceptable salt thereof by no more than about 10% points.

117. Dependent claim 28 depends from claims 4, 3, and 1:

> 3. A method as defined in claim 1, wherein each shaped and cured matrix has been cured by heated air having a temperature of about 62° C. to about 90° C. for a duration of about 15 minutes to about 10 hours, and then is subsequently cooled.
>
> 4. A method as defined in claim 3, wherein said heated air temperature is from about 65° C. to about 90° C., said duration is from about 15 minutes to about 8 hours, and said cooling comprises exposure to an air temperature of less than about 62° C.
>
> 28. A method as defined in claim 4, wherein curing is by convection and said air temperature is measured as a mean exhaust temperature of a convection curing device.

118. Dependent claim 29 depends from claim 1:

> 29. A method as defined in claim 1 wherein said cured shaped tablet has a density that is at least about 1% lower than the density of said shaped tablet prior to curing.

119. Dependent claim 30 depends from claims 4, 3, and 1:

> 30. A method as defined in claim 4 wherein said cured shaped tablet has a density that is at least about 1% lower than the density of said shaped tablet prior to curing.

120. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) will encourage

healthcare providers and patients to practice a method with every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 18-20, and 28-30 of the ’391 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the ’391 patent.

121. Defendants’ ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 18-20, and 28-30 of the ’391 patent.

122. On information and belief, Defendants know that Defendants’ ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) are especially made or especially adapted for use in the infringement of claims 18-20, and 28-30 of the ’391 patent.

123. On information and belief, Defendants have had and continue to have knowledge that there is no substantial non-infringing use for Defendants’ ANDA Products(as detailed in paragraphs 49-51 above and Exhibit S attached hereto).

124. The administration of Defendants’ ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) by any Healthcare

Providers and patients, for the treatment of pain, will directly infringe one or more claims of the ’391 patent, either literally or under the doctrine of equivalents.

125. Defendants’ proposed label for Defendants’ ANDA Products (see paragraph 51 above) will explicitly instruct Healthcare Providers and patients to use Defendants’ ANDA Products in a manner that will directly infringe one or more claims of the ’391 patent, either literally or under the doctrine of equivalents, including claims 18-20 and 28-30 depending from independent claim 1.

126. If Defendants’ ANDA Products are approved by the FDA, Defendants will actively induce others including, *e.g.*, Healthcare Providers and patients, to directly infringe claims 18-20, and 28-30 of the ’391 patent, either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the ’391 patent.

127. Defendants intend to cause direct infringement by others, *e.g.*, Healthcare Providers and patients.

128. If Defendants’ ANDA Products are approved by the FDA, Defendants will take affirmative steps to induce infringement by, among other things, instructing Healthcare Providers and patients, through Defendants’ proposed label (see paragraph 51 above), to use Defendants’ ANDA Products in a manner that directly infringes claims 18-20, and 28-30 of the ’391 patent, either literally or under

the doctrine of equivalents. Thus, Defendants will aid, abet, urge, or encourage others including, *e.g.*, Healthcare Providers and patients, to directly infringe claims 18-20, and 28-30 of the ’391 patent, and Defendants will affirmatively and specifically intend to cause direct infringement.

129. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants’ infringement of the ’391 patent. Purdue has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### (PATENT INFRINGEMENT OF U.S. PATENT NO. 9,492,392)

130. Purdue incorporates by reference and realleges paragraphs 1 through 129 above as though fully restated herein.

131. Pursuant to 35 U.S.C. § 271(e)(2), Defendants’ submission of Defendants’ ANDA to the FDA seeking approval of Defendants’ ANDA Products was an act of infringement of the ’392 patent by Defendants.

132. Defendants’ ANDA Products, or the use or manufacture thereof, are covered by one or more claims of the ’392 patent, either literally or under the doctrine of equivalents, including claims 17-19 and 27-29 depending from independent claim 1, as detailed in Exhibit S attached hereto.

133. Independent claim 1 recites:

1. A cured shaped pharmaceutical tablet comprising:

(1) at least a first compression shaped and then air cured matrix, wherein said curing is without compression, by heated air having a temperature of at least about 62° C. for a duration of at least about 5 minutes, said matrix comprising oxycodone or a pharmaceutically acceptable salt thereof in combination with at least one high molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight selected from the group consisting of 4,000,000, 7,000,000, and a combination thereof, and optionally further comprising at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000;

(2) optionally a second air cured matrix comprising oxycodone or a pharmaceutically acceptable salt thereof in combination with at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000; and

(3) optionally a coating,

wherein, in said tablet:

(i) said oxycodone or pharmaceutically acceptable salt thereof is provided in a dose selected from the group consisting of 10 mg, 15 mg, 20 mg, and 30 mg;

the total combined weight of said low molecular weight polyethylene oxide, if present, and said high molecular weight polyethylene oxide is at least 79% by weight of the total weight of said tablet, excluding the weight of any coatings; and

said low molecular weight polyethylene oxide, if present, is at least 10% by weight of the total weight of said tablet, excluding the weight of any coatings; or

(ii) said oxycodone or pharmaceutically acceptable salt thereof is provided in a dose selected from the group consisting of 40 mg, 60 mg, and 80 mg;

the total combined weight of said low molecular weight polyethylene oxide, if present, and said high molecular weight polyethylene oxide is at least 65% by weight of the total weight of said tablet, excluding the weight of any coatings; and

said low molecular weight polyethylene oxide, if present, is at least 10% by weight of the total weight of said tablet, excluding the weight of any coatings; and

said tablet provides a dosage form for twice-daily extended release administration of oxycodone or pharmaceutically acceptable salt thereof.

134. Dependent claim 17 depends from claim 1:

17. A cured shaped tablet as defined in claim 1, wherein said tablet, when subjected to an indentation test, has at least one of (i) a cracking force of at least 110 N; and (ii) a penetration depth to crack distance of at least 1.0 mm.

135. Dependent claim 18 depends from claim 1:

18. A cured shaped tablet as defined in claim 1, wherein said tablet can be flattened to a thickness that is no more than about 60% of the initial tablet thickness without breaking; and said flattened tablet swells upon exposure to water or ethanol.

136. Dependent claim 19 depends from claim 1:

19. A cured shaped tablet according to claim 1, wherein, after a plurality of at least 100 of the same tablets are stored at 40° C. and 75% relative humidity for at least 3 months, a set of at least ten of said stored tablets, on average, when measured in a USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) at 37° C., in the absence of an added stabilizer, release an amount of said oxycodone or pharmaceutical salt thereof, after 1 hour, 4 hours, and 12 hours, that deviates from an initial dosage amount of said oxycodone or pharmaceutical salt thereof by no more than about 10% points.

137. Dependent claim 27 depends from claim 18:

27. A cured shaped tablet as defined in claim 18, wherein said tablet, when subjected to an indentation test, has at least one of (i) a cracking force of at least 110 N; and (ii) a penetration depth to crack distance of at least 1.0 mm.

138. Dependent claim 28 depends from claim 1:

> 28. A cured shaped tablet as defined in claim 1 wherein said cured shaped tablet has a density that is at least about 1% lower than the density of said shaped tablet prior to curing.

139. Dependent claim 29 depends from claim 4, 3, and 1:

> 3. A cured shaped tablet as defined in claim 1, wherein each shaped and cured matrix has been cured by heated air having a temperature of about 62° C. to about 90° C. for a duration of about 15 minutes to about 10 hours, and then is subsequently cooled.
>
> 4. A cured shaped tablet as defined in claim 3, wherein said heated air temperature is from about 65° C. to about 90° C., said duration is about 15 minutes to about 8 hours, and said cooling comprises exposure to an air temperature of less than about 62° C.
>
> 29. A cured shaped tablet as defined in claim 4 wherein said cured shaped tablet has a density that is at least about 1% lower than the density of said shaped tablet prior to curing.

140. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 17-19, and 27-29 of the '392 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the '392 patent.

141. Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 17-19, and 27-29 of the '392 patent.

142. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants' infringement of the '392 patent. Purdue has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**(PATENT INFRINGEMENT OF U.S. PATENT NO. 9,492,393)**

143. Purdue incorporates by reference and realleges paragraphs 1 through 142 above as though fully restated herein.

144. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the '393 patent by Defendants.

145. Defendants' ANDA Products, or the use thereof, are covered by one or more claims of the '393 patent, either literally or under the doctrine of equivalents, including claims 17-19 and 27-29 depending from independent claim 1, as detailed in Exhibit S attached hereto.

146. Independent claim 1 recites:

> 1. A method of treating pain comprising administering to a patient in need thereof a pharmaceutical tablet comprising:
>
> (1) at least a first compression shaped and then air cured matrix, wherein said curing is without compression by heated air having a

temperature of at least about 62° C. for a duration of at least about 5 minutes, said matrix comprising oxycodone or a pharmaceutically acceptable salt thereof in combination with at least one high molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight selected from the group consisting of 4,000,000, 7,000,000, and a combination thereof, and optionally further comprising at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000;

(2) optionally a second air cured matrix comprising oxycodone or a pharmaceutically acceptable salt thereof in combination with at least one low molecular weight polyethylene oxide having, based on rheological measurements, an approximate molecular weight of less than 1,000,000; and

(3) optionally a coating,

wherein in said tablet:

(i) said oxycodone or pharmaceutically acceptable salt thereof is provided in a dose selected from the group consisting of 10 mg, 15, mg, 20 mg, and 30 mg;

the total combined weight of said low molecular weight polyethylene oxide, if present, and said high molecular weight polyethylene oxide is at least 79% by weight of the total weight of said tablet, excluding the weight of any coatings; and

said low molecular weight polyethylene oxide, if present, is at least 10% by weight of the total weight of said uncoated tablet, excluding the weight of any coatings; or

(ii) said oxycodone or pharmaceutically acceptable salt thereof is provided in a dose selected from the group consisting of 40 mg, 60 mg, and 80 mg;

the total combined weight of said low molecular weight polyethylene oxide, if present, and said high molecular weight polyethylene oxide is at least 65% by weight of the total weight of said tablet, excluding the weight of any coatings; and

said low molecular weight polyethylene oxide, if present, is at least 10% by weight of the total weight of said tablet, excluding the weight of any coatings; and

said tablet provides a dosage form for twice-daily extended release administration of oxycodone or pharmaceutically acceptable salt thereof.

147. Dependent claim 17 depends from claims 15, 5, and 1:

5. A method as defined in claim 1, wherein said shaped tablet is coated at least one of before or after being cured.

15. A method as defined in claim 5, wherein said tablet further comprises magnesium stearate.

17. A method as defined in claim 15, wherein said tablet further comprises at least one of lactose, microcrystalline cellulose and hydroxypropyl cellulose.

148. Dependent claim 18 depends from claim 1:

18. A method as defined in claim 1, wherein said tablet, when subjected to an indentation test, has at least one of (i) a cracking force of at least 110 N; and (ii) a penetration depth to crack distance of at least 1.0 mm.

149. Dependent claim 19 depends from claim 1:

19. A method as defined in claim 1, wherein said tablet can be flattened to a thickness that is no more than about 60% of the initial tablet thickness without breaking; and said flattened tablet swells upon exposure to water or ethanol.

150. Dependent claim 27 depends from claim 19:

27. A method as defined in claim 19, wherein said tablet, when subjected to an indentation test, has at least one of (i) a cracking force of at least 110 N; and (ii) a penetration depth to crack distance of at least 1.0 mm.

151. Dependent claim 28 depends from claims 4, 3, and 1:

3. A method as defined in claim 1, wherein each shaped and cured matrix has been cured by heated air having a temperature of about 62° C. to about 90° C. for a duration of about 15 minutes to about 10 hours, and then is subsequently cooled.

4. A method as defined in claim 3, wherein said heated air temperature is from about 65° C. to about 90° C., said duration is about 15 minutes

> to about 8 hours, and said cooling comprises exposure to an air temperature of less than about 62° C.
>
> 28. A method as defined in claim 4, wherein curing is by convection and said air temperature is measured as a mean exhaust temperature of a convection curing device.

152. Dependent claim 29 depends from claim 1:

> 29. A method as defined in claim 1 wherein said cured shaped tablet has a density that is at least about 1% lower than the density of said shaped tablet prior to curing.

153. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) will encourage healthcare providers and patients to practice a method with every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 17-19, and 27-29 of the '393 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the '393 patent.

154. Defendants' ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 17-19, and 27-29 of the '393 patent.

155. On information and belief, Defendants know that Defendants' ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached

hereto) are especially made or especially adapted for use in the infringement of claims 17-19, and 27-29 of the ’393 patent.

156. On information and belief, Defendants have had and continue to have knowledge that there is no substantial non-infringing use for Defendants’ ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto).

157. The administration of Defendants’ ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) by any Healthcare Providers and patients, for the treatment of pain, will directly infringe claims 17-19, and 27-29 of the ’393 patent, either literally or under the doctrine of equivalents.

158. Defendants’ proposed label for Defendants’ ANDA Products (see paragraph 51 above) will explicitly instruct Healthcare Providers and patients to use Defendants’ ANDA Products in a manner that will directly infringe one or more claims of the ’391 patent, either literally or under the doctrine of equivalents, including claims 17-19 and 27-29 depending from independent claim 1.

159. If Defendants’ ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) are approved by the FDA, Defendants will actively induce others including, *e.g.*, Healthcare Providers and patients, to directly infringe claims 17-19, and 27-29 of the ’393 patent, either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have

acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the ’393 patent.

160. Defendants intend to cause direct infringement by others, *e.g.*, Healthcare Providers and patients.

161. If Defendants’ ANDA Products (as detailed in paragraphs 49-51 above and Exhibit S attached hereto) are approved by the FDA, Defendants will take affirmative steps to induce infringement by, among other things, instructing Healthcare Providers and patients, through Defendants’ proposed label (see paragraph 51), to use Defendants’ ANDA Products in a manner that directly infringes claims 17-19, and 27-29 of the ’393 patent, either literally or under the doctrine of equivalents. Thus, Defendants will aid, abet, urge, or encourage others including, *e.g.*, Healthcare Providers and patients, to directly infringe claims 17-19, and 27-29 of the ’393 patent, and Defendants will affirmatively and specifically intend to cause direct infringement.

162. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants’ infringement of the ’393 patent. Purdue has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF
**(PATENT INFRINGEMENT OF U.S. PATENT NO. 9,775,808)**

163. Purdue incorporates by reference and realleges paragraphs 1

through 162 above as though fully restated herein.

164. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the '808 patent by Defendants.

165. Defendants' ANDA Products, or the use or manufacture thereof, are covered by one or more claims of the '808 patent, either literally or under the doctrine of equivalents, including claims 8 and 10 depending from independent claim 1, and claims 16-17, 20, 22-23, and 25-30 depending from independent claim 11, as detailed in Exhibit S attached hereto.

166. Independent claim 1 recites:

> 1. A pharmaceutical composition comprising:
>
> at least one active agent comprising oxycodone or a pharmaceutically acceptable salt thereof;
>
> at least one high molecular weight polyethylene oxide (PEO), having an approximate molecular weight of from 1 million to 15 million;
>
> at least one of an additive and a film coating; and
>
> optionally at least one low molecular weight PEO having an approximate molecular weight of less than 1,000,000; wherein
>
> (a) the active agent and high molecular weight PEO are combined in a solid oral extended release dosage form that is (i) compression shaped, (ii) air cured by heated air, without compression, for at least about 5 minutes at a temperature above the softening temperature of the high molecular weight PEO, (iii) cooled, and (iv) hardened;
>
> (b) the high molecular weight PEO comprises at least about 30% (by weight) of the dosage form;
>
> (c) the molecular weight of each PEO is based on rheological measurements; and

(d) the total weight of the dosage form is calculated by excluding the combined weight of said film coatings.

167. Dependent claim 8 depends from claims 7, 5, 4, and 1:

4. A pharmaceutical composition according to claim 1, wherein the curing temperature is at least about 60° C. and the curing time is at least about 10 minutes.

5. A pharmaceutical composition according to claim 4, wherein the curing temperature does not exceed about 90° C. and the curing time does not exceed about 24 hours.

7. A pharmaceutical composition according to claim 5, wherein the active agent is present in a dosage amount selected from 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, and 80 mg.

8. A pharmaceutical composition according to claim 7, wherein the dosage form is expanded upon curing, as measured by a decrease in density of at least about 1%, and the dosage form provides a hardness of at least about 439 N.

168. Dependent claim 10 depends from claim 8:

10. A pharmaceutical composition according to claim 8, wherein the dosage form is a tablet, at least one film coating is present; at least one additive is present; and the additive is selected from at least one of an anti-tacking agent, an antioxidant, an immediate release component, and a retardant.

169. Independent claim 11 recites:

11. A pharmaceutical composition comprising:

at least one active agent comprising oxycodone hydrochloride;

at least one high molecular weight polyethylene oxide (PEO) having an approximate molecular weight of from 1 million to 8 million;

at least one additive comprising an anti-tacking agent, an antioxidant, an immediate release component, or a retardant;

optionally a film coating; and

optionally at least one low molecular weight PEO having an approximate molecular weight of less than 1,000,000; wherein

(a) the active agent and high molecular weight PEO are combined in a solid oral extended release dosage form that is (i) compression shaped, (ii) air cured by heated air, without compression, for a curing time of at least about 10 minutes at a curing temperature of at least about 60° C., (iii) cooled, and (iv) hardened;

(b) the high molecular weight PEO comprises at least about 50% (by weight) of the dosage form;

(c) the active agent comprises at least about 5% (by weight) of the dosage form;

(d) the molecular weight of each PEO is based on rheological measurements; and

(e) the total weight of the dosage form is calculated by excluding the combined weight of said film coatings.

170. Dependent claim 16 depends from claims 13, 12, and 11:

12. A pharmaceutical composition according to claim 11, wherein

the dosage form is a tablet;

at least one additive comprises an anti-tacking agent;

the compression shaped tablet is cured and cooled in a convection curing device provided with inlet air, exhaust air, and a bed of free flowing tablets;

the tablet is cured by air having a curing temperature of about 60° C. to about 90° C., for a curing time of about 10 minutes to about 10 hours, and is cooled by air having a cooling temperature below about 50° C.; and

each of the curing temperature and the cooling temperature is one of (a) the temperature of the inlet air, or (b) the temperature of the exhaust air.

13. A pharmaceutical composition according to claim 12, wherein the high molecular weight PEO comprises at least about 65% (by weight) of the tablet; and the active agent is present in a twice-daily dosage amount selected from 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, and 80 mg.

16. A pharmaceutical composition according to claim 13, wherein the tablet is expanded upon curing, as measured by a decrease in tablet density of at least about 2%, and has a hardness of at least about 439 N.

171. Dependent claim 17 depends from claim 16:

17. A pharmaceutical composition according to claim 16, wherein the curing temperature is from about 70° C. to about 85° C.

172. Dependent claim 20 depends from claim 16:

20. A pharmaceutical composition according to claim 16, wherein at least one of the additive and the film coating comprises at least one of butylated hydroxytoluene (BHT), magnesium stearate, talc, silica, fumed silica, colloidal silica dioxide, calcium stearate, carnauba wax, stearic acid, stearyl alcohol, mineral oil, paraffin, micro crystalline cellulose, glycerin, propylene glycol, polyethylene glycol, lactose, povidone, triacetin, and hydroxypropyl cellulose.

173. Dependent claim 22 depends from claim 16:

22. A pharmaceutical composition according to claim 16, wherein the convection curing device is a coating pan and the curing temperature and cooling temperature are each the exhaust temperature of the coating pan.

174. Dependent claim 23 depends from claim 22:

23. A pharmaceutical composition according to claim 22, wherein the curing temperature has a plateau-like temperature profile.

175. Dependent claim 25 depends from claim 16:

25. A pharmaceutical composition according to claim 16, wherein the high molecular weight PEO has an approximate molecular weight selected from 4 million and 7 million.

176. Dependent claim 26 depends from claim 25:

26. A pharmaceutical composition according to claim 25, wherein at least one of the additive and the film coating comprises at least one of butylated hydroxytoluene (BHT), magnesium stearate, talc, silica, fumed silica, colloidal silica dioxide, calcium stearate, carnauba wax, stearic acid, stearyl alcohol, mineral oil, paraffin, micro crystalline cellulose, glycerin, propylene glycol, polyethylene glycol, lactose, povidone, triacetin, and hydroxypropyl cellulose.

177. Dependent claim 27 depends from claim 16:

27. A pharmaceutical composition according to claim 16, wherein the tablet, when subjected to about 15,000 pounds of applied pressure from a hydraulic press, provides a flattened tablet that

is flattened without breaking apart;

has a thickness that is no more than about 60% of the thickness of the non-flattened tablet; and

provides a dissolution of active agent, with ethanol, that deviates no more than about 20% points from the dissolution of a non-flattened reference tablet, without ethanol;

wherein dissolution is measured (i) as a percent amount of active agent released at selected time points up to and including at least a 2 hour period; (ii) using a USP Apparatus 1 (basket) at 37° C. and 100 rpm, in 900 ml simulated gastric fluid without enzymes (SGF) for the non-flattened tablet, and further comprising 40% ethanol for the flattened tablet.

178. Dependent claim 28 depends from claim 27:

28. A pharmaceutical composition according to claim 27, wherein the deviation in dissolution upon flattening is no more than about 15% points.

179. Dependent claim 29 depends from claim 16:

29. A pharmaceutical composition according to claim 16, wherein the tablet,

when measured (a) without an antioxidant additive and (b) as the average of at least 10 of 100 tablet samples stored at 40° C. and 75% relative humidity for at least 3 months;

provides a dissolution of the active agent that deviates no more than about 10% points from the dissolution of a reference tablet before storage;

wherein dissolution is measured (i) as a percent amount of active agent released at selected time points up to and including at least a 12 hour period; (ii) using a USP Apparatus 1 (basket) at 37° C. and 100 rpm, in 900 ml simulated gastric fluid without enzymes (SGF).

180. Dependent claim 30 depends from claim 29:

> 30. A pharmaceutical composition according to claim 29, wherein the deviation in dissolution upon storage is no more than 5% points.

181. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 8, 10, 16-17, 20, 22-23, and 25-30 of the '808 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least the date of the Notice Letter, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the '808 patent.

182. Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 8, 10, 16-17, 20, 22-23, and 25-30 of the '808 patent.

183. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants' infringement of the '808 patent. Purdue has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF
## (PATENT INFRINGEMENT OF U.S. PATENT NO. 11,964,056)

184. Purdue incorporates by reference and realleges paragraphs 1 through 183 above as though fully restated herein.

185. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the '056 patent by Defendants, as detailed in Exhibit S attached hereto.

186. Defendants' ANDA Products, or the use or manufacture thereof, are covered by one or more claims of the '056 patent, either literally or under the doctrine of equivalents, including independent claims 1, 19, and 20, and claims 2-15 dependent therefrom.

187. Independent claim 1 recites:

> 1. A solid oral extended release dosage form, comprising:
>
> an extended release matrix comprising an active agent, magnesium stearate, butylated hydroxytoluene and polyethylene oxide (PEO) having an approximate molecular weight of 1 million Da to 15 million Da based on rheological measurements, wherein the PEO comprises at least about 30% (by weight) of the total weight of the dosage form,
>
> a film coat overcoated on the extended release matrix,
>
> wherein the dosage form provides a dissolution rate, which when measured in a USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) at 37° C., is between 12.5 and 55% (by wt) active agent released after 1 hour, between 25 and 65% (by wt) active agent released after 2 hours, between 45 and 85% (by wt) active agent released after 4 hours and between 55 and 95% (by wt) active agent released after 6 hours, and
>
> wherein the dosage form is expanded upon curing, as measured by a decrease in density of at least about 1.0% as determined by Archimedes Principle using a liquid of known density ($\rho_0$).

188. Dependent claim 2 depends from claim 1:

2. The solid oral extended release dosage form of claim 1, wherein the PEO has an approximate molecular weight of 2 million Da to 8 million Da based on rheological measurements.

189. Dependent claim 3 depends from claim 2:

3. The solid oral extended release dosage form of claim 2, wherein the dosage form provides an in-vitro dissolution rate, when measured in a USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) comprising 40% ethanol at 37° C., characterized by the percent amount of active released at 0.5 hours, that deviates no more than about 20% points 0.5 hours from the corresponding in-vitro dissolution rate measured in a USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) at 37° C. without ethanol.

190. Dependent claim 4 depends from claim 3:

4. The solid oral extended release dosage form of claim 3, that is cured at a curing temperature ranging from about 62° C. to about 90° C.

191. Dependent claim 5 depends from claim 4:

5. The solid oral extended release dosage form of claim 4, that is cured at a curing temperature ranging from about 68° C. to about 85° C.

192. Dependent claim 6 depends from claim 5:

6. The solid oral extended release dosage form of claim 5, wherein the curing time is from about 15 minutes to about 10 hours.

193. Dependent claim 7 depends from claim 6:

7. The solid oral extended release dosage form of claim 6, wherein the curing time is from about 30 minutes to about 4 hours.

194. Dependent claim 8 depends from claim 7:

8. The solid oral extended release dosage form of claim 7, when subjected to a maximum force of about 196 N or about 439 N in a tablet hardness test, does not break.

195. Dependent claim 9 depends from claim 8:

9. The solid oral extended release dosage form of claim 8, wherein the tablet when subjected to an indentation test resists a work of at least about 0.06 J without cracking.

196. Dependent claim 10 depends from claim 9:

10. The solid oral extended release dosage form of claim 9, wherein the active agent is an opioid analgesic.

197. Dependent claim 11 depends from claim 10:

11. The solid oral extended release dosage form of claim 10, wherein the opioid analgesic is selected from alfentanil, allylprodine, alphaprodine, anileridine, benzylmorphine, bezitramide, buprenorphine, butorphanol, clonitazene, codeine, desomorphine, dextromoramide, dezocine, diampromide, diamorphone, dihydrocodeine, dihydromorphine, dimenoxadol, dimepheptanol, dimethylthiambutene, dioxaphetyl butyrate, dipipanone, eptazocine, ethoheptazine, ethylmethylthiambutene, ethylmorphine, etonitazene, etorphine, dihydroetorphine, fentanyl and derivatives, hydrocodone, hydromorphone, hydroxypethidine, isomethadone, ketobemidone, levorphanol, levophenacylmorphan, lofentanil, meperidine, meptazinol, metazocine, methadone, metopon, morphine, myrophine, narceine, nicomorphine, norlevorphanol, normethadone, nalorphine, nalbuphene, normorphine, norpipanone, opium, oxycodone, oxymorphone, papaveretum, pentazocine, phenadoxone, phenomorphan, phenazocine, phenoperidine, piminodine, piritramide, propheptazine, promedol, properidine, propoxyphene, sufentanil, tilidine, tramadol or pharmaceutically acceptable salts thereof.

198. Dependent claim 12 depends from claim 11:

12. The solid oral extended release dosage form of claim 11, wherein the opioid analgesic is oxycodone hydrochloride.

199. Dependent claim 13 depends from claim 12:

13. The solid oral extended release dosage form of claim 12, that provides a mean tmax of oxycodone at about 2 to about 6 hours.

200. Dependent claim 14 depends from claim 13:

14. The solid oral extended release dosage form of claim 13, comprising from about 10 mg to about 160 mg oxycodone hydrochloride and wherein the dosage form provides a mean maximum plasma concentration (Cmax) of oxycodone from about 6 ng/mL to about 240 ng/mL.

201. Dependent claim 15 depends from claim 14:

15. The solid oral extended release dosage form of claim 14, wherein the oxycodone hydrochloride has a 14-hydroxycodeinone level of less than about 25 ppm.

202. Independent claim 19 recites:

19. A solid oral extended release dosage form comprising: (i) an extended release matrix comprising from about 10 mg to about 160 mg oxycodone hydrochloride, magnesium stearate, butylated hydroxytoluene and polyethylene oxide (PEO) having an approximate molecular weight of 1 million Da to 15 million Da based on rheological measurements, wherein the PEO comprises at least about 30% (by weight) of the total weight of the dosage form and (ii) a film coat overcoated on the extended release matrix; wherein the dosage form provides a mean maximum plasma concentration (Cmax) of oxycodone from about 6 ng/mL to about 240 ng/mL and wherein the dosage form is expanded upon curing, as measured by a decrease in density of at least about 1.0% as determined by Archimedes Principle using a liquid of known density ($\rho 0$).

203. Independent claim 20 recites:

20. A solid oral extended release dosage form comprising: (i) an extended release matrix comprising oxycodone hydrochloride, magnesium stearate, butylated hydroxytoluene and polyethylene oxide (PEO) having an approximate molecular weight of 1 million Da to 15 million Da based on rheological measurements and (ii) a film coat overcoated on the extended release matrix; wherein the dosage form provides an in-vitro dissolution rate, when measured in a USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) comprising 40% ethanol at 37° C., characterized by the percent amount of oxycodone hydrochloride released at 0.5 hours, that deviates no more than about 20% points 0.5 hours from the corresponding in-vitro dissolution rate measured in a

> USP Apparatus 1 (basket) at 100 rpm in 900 ml simulated gastric fluid without enzymes (SGF) at 37° C. without ethanol and wherein the dosage form is expanded upon curing, as measured by a decrease in density of at least about 1.0% as determined by Archimedes Principle using a liquid of known density (ρ0).

204. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 1-15, and 19-20 of the '056 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents. Since at least June 27, 2024, Defendants have acted with knowledge, or at least with willful blindness of the fact, that the induced acts would constitute infringement of the '056 patent.

205. Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 1-15, and 19-20 of the '056 patent.

206. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants' infringement of the '056 patent. Purdue has no adequate remedy at law.

## NINTH CLAIM FOR RELIEF
### (PATENT INFRINGEMENT OF U.S. PATENT NO. 9,775,811)

207. Purdue incorporates by reference and realleges paragraphs 1

through 206 above as though fully restated herein.

208. Pursuant to 35 U.S.C. § 271(e)(2), Defendants' submission of Defendants' ANDA to the FDA seeking approval of Defendants' ANDA Products was an act of infringement of the '811 patent by Defendants.

209. On information and belief, the process for making Defendants' ANDA Products is covered by one or more claims of the '811 patent, either literally or under the doctrine of equivalents, including claims 28-30 depending from independent claim 11, as detailed in Exhibit S attached hereto.

210. Independent claim 11 recites:

> 11. A method of producing a plurality of solid oral extended release pharmaceutical tablets comprising the steps of:
>
> mixing an active agent comprising oxycodone or a pharmaceutically acceptable salt thereof, and at least one high molecular weight polyethylene oxide (PEO), having an approximate molecular weight of from 1 million to 8 million, to provide a PEO composition;
>
> compressing the PEO composition to provide a plurality of tablet shaped matrix compositions;
>
> curing the shaped matrix compositions by exposure to heated air at a curing temperature that is at least about 60° C. for a curing time of at least about 10 minutes, to provide a plurality of cured matrix compositions;
>
> cooling the cured matrix compositions;
>
> combining the matrix compositions with at least one additive, before or after curing; and
>
> optionally providing the cured matrix compositions with at least one film coating, after curing and cooling;
>
> wherein

(a) the molecular weight of each PEO is based on rheological measurements;

(b) the high molecular weight PEO comprises at least about 50% (by weight) of each tablet;

(c) the active agent comprises more than about 5% (by weight) of each tablet;

(d) the total weight of each tablet is calculated by excluding the combined weight of said film coating; and

(e) each cured matrix composition comprises a solid oral pharmaceutical tablet that provides an extended release of at least one active agent.

211. Dependent claim 28 depends from claims 26, 22, 21, 20, 14, 12, and 11:

12. A method according to claim 11, wherein

at least one additive comprises an anti-tacking agent;

the curing and cooling steps are conducted in a convection curing device comprising a bed of free flowing tablets;

the heated air comprises inlet air and exhaust air entering and leaving the convection curing device;

the curing temperature does not exceed about 90° C.;

the curing time does not exceed about 10 hours;

the cooling temperature is below about 50° C.; and

each of the curing temperature and the cooling temperature is one of (a) the temperature of the inlet air, (b) the temperature of the exhaust air; and (c) the temperature inside the convection curing device.

14. A method according to claim 12, wherein each of the curing temperature and the cooling temperature is the temperature of the exhaust air.

20. A method according to claim 14, wherein the high molecular weight PEO has an approximate molecular weight selected from 4 million and 7 million.

21. A method according to claim 20, wherein

the step of compressing the PEO composition comprises tableting by direct compression;

the convection curing device comprises a coating pan;

the curing temperature optionally has a plateau-like profile;

the film coating is present and is combined with the matrix composition, in the coating pan; and

the coating pan has a rotation speed selected for each of the curing, cooling, and film coating steps.

22. A method according to claim 21, wherein the active agent is oxycodone hydrochloride in a dosage amount selected from 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, and 80 mg.

26. A method according to claim 22, wherein the high molecular weight PEO comprises at least about 65% (by weight) of each tablet.

28. A method according to claim 26, wherein the cured and cooled tablets have a hardness of at least about 439 N; and the tablets expand upon curing, as measured by a decrease in tablet density of at least about 1.5%.

212. Dependent claim 29 depends from claim 26:

29. A method according to claim 26, wherein the tablet, when subjected to about 15,000 pounds of applied pressure from a hydraulic press, provides a flattened tablet that

is flattened without breaking apart;

has a thickness that is no more than about 60% of the thickness the non-flattened tablet; and

provides a dissolution of active agent, with ethanol, that deviates no more than about 20% points from the dissolution of a non-flattened reference tablet, without ethanol;

wherein dissolution is measured (i) as a percent amount of active agent released at selected time points up to and including at least a 1 hour period; (ii) using a USP Apparatus **1** (basket) at 37° C. and 100 rpm, in 900 ml simulated gastric fluid without enzymes (SGF) for the non-flattened tablet, and further comprising 40% ethanol for the flattened tablet.

213. Dependent claim 30 depends from claim 26:

> 30. A method according to claim 26, wherein the tablet,
>
> when measured (a) without an antioxidant additive and (b) as the average of at least 10 of 100 tablet samples stored at 40° C. and 75% relative humidity for at least 3 months;
>
> provides a dissolution of the active agent that deviates no more than about 10% points from the dissolution of a reference tablet before storage;
>
> wherein dissolution is measured (i) as a percent amount of active agent released at selected time points up to and including at least a 12 hour period; (ii) using a USP Apparatus **1** (basket) at 37° C. and 100 rpm, in 900 ml simulated gastric fluid without enzymes (SGF).

214. On information and belief, Defendants' ANDA Products, or the use or manufacture thereof (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and are covered by claims 28-30 of the '811 patent, either literally or under the doctrine of equivalents.

215. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claims 28-30 of the '811 patent under 35 U.S.C. § 271(a)-(c), either literally or under the doctrine of equivalents.

216. If approved by the FDA, Defendants' importation, offer for sale, sale, and/or use of the oxycodone HCl API in Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each

and every element detailed above and will infringe claims 28-30 of the ’811 patent under 35 U.S.C. § 271(g), either literally or under the doctrine of equivalents.

217. Defendants’ ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by claims 28-30 of the ’811 patent.

218. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants’ infringement of the ’811 patent. Purdue has no adequate remedy at law.

## TENTH CLAIM FOR RELIEF
### (PATENT INFRINGEMENT OF U.S. PATENT NO. 9,763,886)

219. Purdue incorporates by reference and realleges paragraphs 1 through 218 above as though fully restated herein.

220. Pursuant to 35 U.S.C. § 271(e)(2), Defendants’ submission of Defendants’ ANDA to the FDA seeking approval of Defendants’ ANDA Products was an act of infringement of the ’886 patent by Defendants.

221. On information and belief, the method for making Defendants’ ANDA Products is covered by one or more claims of the ’886 patent, either literally or under the doctrine of equivalents, including claim 30 depending from independent claim 11, as detailed in Exhibit S attached hereto.

222. Independent claim 11 recites:

11. A method of producing a plurality of solid oral extended release pharmaceutical tablets comprising the steps of:

mixing at least one active agent comprising an opioid or a pharmaceutically acceptable salt thereof, and at least one high molecular weight polyethylene oxide (PEO) having an approximate molecular weight of from 1 million to 8 million, to provide a PEO composition;

compressing the PEO composition to provide a plurality of tablet shaped matrix compositions;

curing the shaped matrix compositions by exposure to heated air at a curing temperature that is at least about 60° C. for a curing time of at least about 10 minutes, to provide a plurality of cured matrix compositions;

cooling the cured matrix compositions;

combining the matrix compositions with at least one additive, before or after curing; and

optionally providing the cured matrix compositions with at least one film coating, after curing and cooling; wherein

(a) the molecular weight of each PEO is based on rheological measurements;

(b) the high molecular weight PEO comprises at least about 50% (by weight) of each dosage form;

(c) the total weight of each tablet is calculated by excluding the combined weight of said film coating; and

(d) each cured matrix composition comprises a solid oral pharmaceutical tablet that provides an extended release of at least one active agent.

223. Dependent claim 30 depends from claims 28, 19, 15, 13, and 11:

13. A method according to claim 11, wherein

at least one additive comprises an anti-tacking agent;

the curing and cooling steps are conducted in a convection curing device comprising a bed of free flowing tablets;

the heated air comprises inlet air and exhaust air entering and leaving the convection curing device;

the curing temperature does not exceed about 90° C.;

the curing time does not exceed about 10 hours;

the cooling temperature is below about 50° C.; and

each of the curing temperature and the cooling temperature is one of (a) the temperature of the inlet air, (b) the temperature of the exhaust air; and (c) the temperature inside the convection curing device.

15. A method according to claim 13, wherein each of the curing temperature and the cooling temperature is the temperature of the exhaust air.

19. A method according to claim 15, wherein the high molecular weight PEO has an approximate molecular weight that is selected from 1 million, 2million, 4 million, and 7 million.

28. A method according to claim 19, wherein the active agent (i) is selected from the group consisting of buprenorphine, oxycodone, oxymorphone, hydrocodone, hydromorphone, morphine, and pharmaceutically acceptable salts thereof, and (ii) is at least about 5% (by weight) of each tablet.

30. A method according to claim 28, wherein at least one film coating is present; the high molecular weight PEO is selected from 4 million and 7 million; the cured and cooled tablets have a hardness of at least about 439 N; and the tablets expand upon curing, as measured by a decrease in tablet density of at least about 1%.

224. Defendants' ANDA Products, or the use or manufacture thereof, are covered by claim 30 of the '886 patent, either literally or under the doctrine of equivalents.

225. If approved by the FDA, Defendants' commercial manufacture, use, importation, sale, and/or offer for sale of Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe, contribute to the infringement of, and/or induce the infringement of claim 30 of the '886 patent under 35 U.S.C.

§ 271(a)-(c), either literally or under the doctrine of equivalents.

226. If approved by the FDA, Defendants' importation, offer for sale, sale, and/or use of the oxycodone HCl API in Defendants' ANDA Products(as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) contains each and every element detailed above and will infringe claim 30 of the '886 patent under 35 U.S.C. § 271(g), either literally or under the doctrine of equivalents.

227. Defendants' ANDA Products (as detailed in paragraphs 49 and 50 above and Exhibit S attached hereto) constitute a material part of the inventions covered by the claims of the '886 patent.

228. Unless Defendants are enjoined by the Court, Purdue will be substantially and irreparably harmed by Defendants' infringement of the '886 patent. Purdue has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Find that Defendants have infringed one or more claims of each of the patents-in-suit, and that the commercial sale, offer for sale, use, importation, and/or manufacture of Defendants' ANDA Products would infringe, induce infringement of, and/or contribute to the infringement of one or more claims of each of the patents-in-suit, either literally or under the doctrine of equivalents;

B. Find, pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of Defendants' ANDA and Defendants' ANDA Products, under § 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), to be a date not earlier than the last date of expiration of the patents-in-suit, plus any additional periods of extension or exclusivity attached thereto;

C. Preliminarily and permanently enjoining, pursuant to 35 U.S.C. §§ 271(e)(4)(B) and 283 and Fed. R. Civ. P. 65, Defendants, their officers, partners, agents, servants, employees, parents, subsidiaries, divisions, affiliate corporations, other related business entities, and all other persons acting in concert, participation, or in privity with them, and their successors and assigns, from any commercial manufacture, use, offer to sell, or sale within the United States, or importation into the United States, of any drug product that is the subject of Defendants' ANDA, including Defendants' ANDA Products or any other drug product that infringes the patents-in-suit;

D. Award Plaintiffs such other and further relief as this Court may deem just and proper.

s/ Wayne W. Fang______
s/ Freda L. Wolfson______
Wayne W. Fang
Freda L. Wolfson
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, New Jersey 07068
Tel: 973.597.2500
Fax: 973.597.2400

*Attorneys for Plaintiffs*

OF COUNSEL:
s/ John J. Normile_
s/ Gasper J. LaRosa_
s/ Kevin V. McCarthy_
John J. Normile
Gasper J. LaRosa
Kevin V. McCarthy
JONES DAY
250 Vesey Street
New York, NY 10281-1047
212.326.3777

s/ Daniel G. Brown
Daniel G. Brown
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
212.906.1200

s/ Marc N. Zubick
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
312.876.7700
*Attorneys for Plaintiffs*

July 8, 2025